**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Joseph G. Rosania, Jr.

| | |
|---|---|
| In re:<br><br>VINCENT CHARLES MATTORANO JR, and VERONICA LISA MATTORANO,<br><br>Debtors.<br>Last four digits of SS#: 4790 and 9987 | Case No. 20-11814-JGR<br>Chapter 13 |

**MEMORANDUM OPINION CONFIRMING CHAPTER 13 PLAN**

THIS MATTER comes before the Court on the Corrected Second Amended Chapter 13 Plan ("Plan") filed by Debtors Veronica Lisa Mattorano and Vincent Charles Mattorano, Jr. (collectively, "Debtors") on February 17, 2021 (Doc. 178), and the objection thereto filed by judgment creditors Jamie Watson and Cheri Ells (collectively, "Creditors") on February 2, 2021 (Doc. 173), which was joined by creditor Xochilt Najar ("Najar") on February 4, 2021 (Doc. 174).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Bankruptcy court is a court of last resort. Chapter 13 bankruptcy is often referred to as a "soft landing place" for debtors in financial distress. It allows debtors to cure pre-petition defaults and retain their homes and vehicles; pay pre-petition income taxes over time; take advantage of the automatic stay of collection actions; and restructure debts. The questions presented here are whether Debtors have filed their case and proposed their Plan in good faith and whether the Plan is feasible.

At hearings on May 18 and 19, 2021, the Court admitted approximately 75 exhibits and heard the testimony of four witnesses: the two Debtors; the accountant for Debtors, Betty G. Smith; and Jamie Watson. The Court finds that Debtors have filed their case and proposed a feasible plan in good faith and hereby confirms the Plan, thereby reaching an outcome that serves the best interest of all creditors.

**I.   BACKGROUND**

**A. The Construction Project**

Debtors operated a company known as Innovative Baths and Remodeling, Inc. ("Innovative"). Vincent Charles Mattorano, Jr. ("Mr. Mattorano") was in charge of the construction design and implementation and his wife, Veronica Lisa Mattorano ("Mrs. Mattorano"), did the marketing and maintained the books and records. In August 2016, Innovative entered into a construction contract with Creditors to build an addition on

Creditors' home. Creditors advanced the sum of $60,000 to Innovative for the work to be performed. Excavation began in November 2016 and a foundation was poured in December 2016, after which the parties got into a dispute about the quality and progress of the job. Creditors terminated the contract in March 2017 and demanded that Innovative refund the $60,000. Innovative declined. On July 17, 2017, Creditors sued Innovative and Debtors in Adams County District Court, Case No. 17CV31214, and asserted ten claims for relief ("State Court Action").

### B. The State Court Action and Appeal

The State Court Action was the subject of a four-day bench trial in September 2018. The state court entered its Findings of Fact, Conclusions of Law and Entry of Judgment on May 3, 2019. (Watson Ex. I.) The state court issued a 33-page opinion and entered judgment in favor of Creditors and against Debtors in the total amount of $102,645 on the claims for breach of contract, breach of warranty, negligence, and fraud. The state court denied Creditors' civil theft claim. On July 25, 2019, the state court amended the judgment twice, once to include pre-judgment interest (Watson Ex. BBB) and then to add post-judgment interest (Watson Ex. CCC).

Debtors appealed the state court judgment to the Colorado Court of Appeals, Case No. 2019CA1683 ("Appeal"), and Creditors cross-appealed for treble damages on their civil theft claim. On April 27, 2020, the Court granted relief from stay in Debtors' bankruptcy case to allow the Appeal to proceed. On August 5, 2021, the Court of Appeals issued a 21-page opinion in the Appeal. It affirmed the judgment of the state court rejecting all issues raised by Debtors and remanded the civil action to the trial court on the issue of whether Creditors are entitled to treble damages for civil theft. The Court has not received any information on whether Debtors are seeking a review from the Colorado Supreme Court or the status of the remanded action.

### C. Post-Judgment Collection Activity

After the entry of the judgment, Creditors propounded extensive written discovery under Colo. R. Civ. P. 69. They served Debtors with three sets of post-judgment interrogatories (Watson Ex. D, F, and U) containing 115 questions. Creditors claim Mrs. Mattorano lied under oath in her answers to the interrogatories. They claim she failed to list several Chase Bank accounts, two Axos online bank accounts, a Paypal bank account, a Lokal Homes escrow account for the purchase of the house in Commerce City (Watson Ex. H), the identity of Innovative's customers, and a gift from Mrs. Mattorano's parents for a down payment used to purchase the home.

Mrs. Mattorano testified that she completed the answers to the interrogatories without the assistance of counsel to the best of her ability. She stated that she never had to complete answers to interrogatories before, was confused on the bank account question since the Axos bank accounts were online nontraditional accounts, and simply made honest mistakes. She claimed she was not aware she had to list the Lokal Homes escrow account, since her parents gave her the money for the down payment for the

house. She stated that although her state court counsel continued to represent her by name only, the law firm did not review the questions and answers with her prior to submission. She testified that her counsel merely notarized her answers and forwarded them to opposing counsel. The Court notes that the answers were handwritten with many pages of attachments and that Mrs. Mattorano was not even familiar with the paralegal of her law firm who returned her answers.

A post-judgment dispute arose after Creditors served a writ of garnishment on a business bank account at Chase Bank. Debtors claimed the money in that bank account consisted of customer deposits and was not their property. The matter went to hearing in state court. The state court disagreed with Debtors' position and ordered the payment of all the funds in the Chase business account, approximately $8,000, to Creditors pursuant to the writ of garnishment. Mrs. Mattorano testified that Chase closed all their bank accounts after checks in transit were returned for insufficient funds.

Creditors served a writ of garnishment on one of Debtors' construction customers, Paul Garcia, which was representative of the extreme lengths travelled by Creditors to collect on the judgment.

Creditors received approximately $50,000 of insurance proceeds from the company that provided insurance to Debtors and their construction business, which satisfied a portion of the judgment.

## II. BANKRUPTCY CASE

Debtors filed a Chapter 13 bankruptcy case on March 12, 2020, thereby obtaining an automatic stay of Creditors' collection efforts. Creditors filed a Proof of Claim in the bankruptcy case on April 21, 2020, Claim No. 6, in the amount of $118,547.95. The claim is filed as a secured and priority claim. Debtors obtained an order from this Court on July 16, 2020, avoiding the secured portion of the claim. There is no basis of priority set forth in the Proof of Claim, nor does the Court believe the claim is entitled to priority status. Thus, for purposes of this order, the Court is treating the Proof of Claim as an unsecured claim.[1]

### A. Discovery Dispute and Litigation in Bankruptcy Case

The bankruptcy case did not dissuade Creditors from their collection efforts. They conducted Bankruptcy Rule 2004 discovery of Debtors by taking their depositions and requesting the production of documents. Creditors claim Debtors also lied under oath in their bankruptcy schedules by failing to list two Axos online bank accounts, certain motor vehicles, and miscellaneous personal property. Debtors claim they immediately amended their bankruptcy schedules in July 2020 and January 2021 to identify the omitted assets

---

[1] It is an example of over-reaching by the Creditors to claim priority under oath in a proof of claim without any factual or legal basis for doing so.

after the matters were brought to their attention, and that the motor vehicles and washer and dryer did not have significant value.

On June 17, 2020, Creditors sought relief from stay under 11 U.S.C. § 362(b)(4), the governmental regulatory exception, to return to state court to seek civil contempt damages against Debtors to effectuate public policy for allegedly submitting intentionally false answers to the Rule 69 interrogatories. Debtors objected, arguing that the purpose of the motion for relief from stay was to continue harassing Debtors. On July 21, 2020, after a hearing, the Court denied the motion for relief from stay, finding that the purpose of returning to state court was to adjudicate private rights and punish Debtors, not to effectuate public policy.

A discovery dispute arose in the bankruptcy case when Creditors asked Debtors for copies of their accounting records and the identity of their construction clients. On July 16, 2020, Debtors moved for a protective order arguing that Creditors had Debtors' most recent income tax returns and bank records, citing concerns that Creditors would contact their customers as had occurred before the bankruptcy case was filed. On July 21, 2020, after a hearing, the Court granted the motion for protective order after balancing the Creditors right to information against the fear the Creditors would contact the customers and destroy the Debtors' business, to the detriment of all creditors.

### B. Adversary Proceeding

Creditors timely filed an adversary proceeding against Debtors on June 22, 2020, Adversary Proceeding No. 20-1189-JGR, in which they asserted claims for a non-dischargeable debt for fraud, breach of fiduciary duty, and willful and malicious injury.

Debtors did not defend the adversary proceeding, and the Court entered default against them on November 30, 2020. On December 4, 2020, Creditors requested an extension of time to file a motion for default judgment for a damage award until after the appeal was resolved and damages were awarded by the Colorado Court of Appeals. On December 7, 2020, the Court granted the motion. After the ruling of the Court of Appeals, which has not yet become final, Creditors moved for default judgment on August 19, 2021. Because the appellate ruling is not final, Creditors' non-dischargeable debt has not yet been liquidated.

Debtors have not responded to the Motion for Default Judgment and acknowledge that they owe Creditors a non-dischargeable debt.[2] However, they beseech the Court to confirm their Plan, allow them to live their lives without continued harassment from Creditors for sixty months, and, at the end of sixty months, use the equity in their house to satisfy the remaining portion of the non-dischargeable debt owed to Creditors.

---

[2] Debtors did not defend another adversary proceeding brought by creditor Xochilt Najar (previously defined as "Najar"), Case No. 20-1186-JGR, which resulted in the entry of a judgment that Debtors owed Najar a non-dischargeable debt under 11 U.S.C. § 523(a)(2)(A) in the principal amount of $51,319.01 (Docs. 44, 45).

4

### C. Chapter 13 Case

#### 1. Assets and Liabilities

Debtors own a house located at 11698 Olathe Street, Commerce City, Colorado valued at $568,000, subject to a mortgage in the amount of $547,272; ten older motor vehicles, most of which are used in the business; business equipment; an RV used in the business; household goods; and two bank accounts, all of which they have claimed as exempt. They do not have any retirement accounts. The late-model vehicles are subject to liens which exceed the respective values of the vehicles.

#### 2. Income and Expenses

Both Debtors work in a construction business now called Premier Remodeling and Design ("Premier"). Their estimated monthly gross income of $11,700 is derived from the 2020 income tax returns. They are committing all disposable income to the Plan. Their expenses include a monthly mortgage payment in the amount of $3,258, income taxes, vehicle payments, health and vehicle insurance, and other miscellaneous expenses, all of which are reasonable to the Court. Debtors testified that they gave up their life insurance, so that they no longer had to pay monthly premiums, in order to increase the amount they are paying under the Chapter 13 Plan.

#### 3. Plans

Debtors have put forth four plans, the latest dated February 17, 2021 (previously defined as "Plan"). Objections were filed in opposition to the Plan by the Chapter 13 Trustee, Creditors, and creditor Najar. The Chapter 13 Trustee later withdrew his objection and Najar did not pursue her objection, leaving Creditors' objection as the only obstacle to confirmation.

The terms of the sixty-month Plan are that Debtors will make monthly payments to the Chapter 13 Trustee, to be increased over the life of the Plan. They will pay $689 for ten months, $1,499 for twenty months, $2,537 for thirteen months, $2,703 for two months, and $3,202 for fifteen months. Debtors will make the monthly mortgage payment directly to the mortgage company. The step-ups in the monthly plan payments coincide with the pay-off of several secured debt obligations over time.

The Chapter 13 Trustee's compensation is $12,330, and counsel for Debtors compensation is $17,000. Counsel for Debtors will be required to file a detailed fee application for approval of the estimated fees. The Plan provides for the payment of federal and state priority income tax claims in the total amount of $34,664. Finally, the Plan provides for the payment of $57,265 to the class of unsecured claims, which includes Creditors. Debtors contend this equals a 33% distribution to unsecured creditors.

### D. Confirmation Objections

Creditors have many objections to confirmation. Their central arguments are that the case has not been filed in good faith and the Plan has not been proposed in good faith, premised on the state court judgment that found that Debtors defrauded Creditors. Their arguments are buttressed by the alleged intentionally false statements made by Mrs. Mattorano under oath in the answers to the collection interrogatories and by Debtors in their bankruptcy schedules.

Creditors also argue that bad faith is shown by the Debtors "double dipping" on expenses by charging certain expenses against both their business and personal income. They also complain that Debtors bought a luxury home between the state court trial and judgment and are funneling income to pay their home mortgage and increase their exempt equity in the house instead of paying Creditors.

Finally, Creditors complain that a non-dischargeable judgment is not enough and that the Court should deny confirmation and dismiss the Chapter 13 case so they can resume their collection efforts until the judgment is satisfied.

Debtors admit they have been "imperfect" in their discovery responses. They point out that Creditors have collected $8,000 from them pursuant to the judgment, and Creditors received $50,0000 from the insurance company insuring Debtors' business. Debtors testified that they purchased a $580,000 home[3] in Commerce City because they had to move from a rental property they were occupying. They explain that the Commerce City home is not a luxury home and the amount of the monthly mortgage payment ($3,258) is roughly equal to the amount of the rent they were paying ($2,740). Once the tax benefits of home ownership are considered, namely, deducting real property taxes and mortgage interest, they assert the difference is not significant. Finally, they point out that neither the Chapter 13 Trustee nor any other creditor is objecting to confirmation. The Court notes that the Chapter 13 Trustee filed multiple detailed objections to confirmation, all of which were consensually resolved.

### III. WITNESS TESTIMONY

**Veronica L. Mattorano** testified credibly on direct examination in support of confirmation. She is 54 years old with a 10th grade education. She does the marketing, website, bookkeeping, and banking for the business. She stated that she works closely with the accountant for the business, Betty G. Smith ("Smith"), who has complete access to the financials of the company. She and her husband have four motor vehicles. The business has three employees, leases an office, and uses several old motor vehicles and a trailer.

Mrs. Mattorano stated that the revenue of the company has increased since the start of the pandemic. She used the 2020 income tax returns to arrive at the monthly

---

[3] The average price of a home in Denver in May 2021 was $512,000. (Debtors Ex. 13 at 7.)

personal joint gross income of $11,700 to fund the Plan. She testified that the business and personal expenses are accounted for separately with the involvement of Smith.

She said she amended the bankruptcy schedules twice to disclose various assets, including a Honda motorcycle titled in her husband's name but used by her son, certain other older vehicles, bank accounts, and a refrigerator and washer/dryer. (Debtors Ex. 3 and 5.) She testified that any omissions were the product of not understanding the forms or mistake. She understood that Creditors would be closely scrutinizing her filings, so she attempted to be as accurate as possible. She provided numerous documents to the Chapter 13 Trustee.

She stated that she and her husband moved from a rental property to a home they purchased in 2019 because the lease expired. The home is a modest four-bedroom home in Commerce City, Colorado, purchased for $568,000. They use one of the bedrooms for a home office and the other two bedrooms when their parents and/or grandson visit. They entered into an agreement with a real estate broker in February 2019; the state court judgment was entered in favor of Creditors in June 2019; and Debtors closed on the home in October 2019.

She explained that the collection efforts of Creditors caused the Chapter 13 filing. This is their first bankruptcy case. She testified that they can make the Plan payments, the monthly payments increase in the future as certain secured motor vehicle debts are retired, they chose a sixty-month plan period to provide the highest return to Creditors, and they are doing their best to pay their creditors.

On cross-examination, she admitted to errors in answering the interrogatories and completing the bankruptcy forms but claimed there was no motivation to be dishonest especially, where as here, her answers and financial affairs would be closely scrutinized by Creditors.

**Betty G. Smith** is an accountant who works for Debtors in preparing income tax returns. She credibly testified that she has direct access to their business computer and reviews the business financials from QuickBooks. Debtors give her complete access to all financial information, including bank statements, and provide documents to her upon request. She keeps track of the allocation between business and personal expenses and allocates such expenses for Debtors. She stated that Debtors are not "double dipping" on expenses.

**Vincent C. Mattorano, Jr.** credibly testified that he believed the business income is accurate and supports making the Plan payments. He stated that since the business's profit margin is between 10% and 15%, the money in the business account was 90% owned by the customers and 10% owned by Debtors as profit. He did not set up a separate business trust account. He and Mrs. Mattorano purchased the RV to use when they had out-of-town jobs, and it has not been used for personal purposes. He relies on Betty G. Smith, with whom he has worked for many years, to prepare the tax returns.

7

He stated that he and Mrs. Mattorano had to move out of their rental and bought a new house because the price was not much higher than houses which were 10-to-15 years older. They signed a contract to buy the house before the entry of the state court judgment. Debtors did not believe they would lose in state court. It is the first house he ever purchased.

**Jamie Watson** was the only witness called by Creditors. She is still extremely angry at Debtors almost five years after the failed construction project. She testified the money received from insurance paid a separate judgment and that Creditors are not requesting to get paid twice on the same judgment.

## IV. ANALYSIS

The Court has subject matter jurisdiction over this core proceeding under 28 U.S.C. § 1334(b), § 157(b)(2)(A), and § 157(b)(2)(L) since the matter involves the administration of the bankruptcy estate and confirmation of a plan.

The burden of proof is on Debtors to show they have satisfied the confirmation standards set forth in 11 U.S.C. § 1325 by a preponderance of the evidence. *In re Melendez*, 597 B.R. 647, 657-58 (Bankr. D. Colo. 2019).

### A. Good Faith

Under 11 U.S.C. § 1325(a)(3) and (a)(7), the Court can only confirm a Chapter 13 plan if the plan has been proposed in good faith and the case has been filed in good faith. The good faith analysis begins with the Tenth Circuit's seminal case of *Flygare v. Boulden (In re Flygare)*, 709 F.2d 1344 (10th Cir. 1983). The Court is to examine the totality of the circumstances on a case-by-case basis in order to determine if the plan is an abuse of the provisions, purpose, or spirit of Chapter 13. *Flygare*, 709 F.2d at 1347-48. *Flygare* posited eleven factors that the Court should examine, but these factors are not exhaustive, and the weight accorded to each factor will vary from case to case. *Id.*

The factors and this Court's analysis of their applicability in this case are as follows:

| *Flygare* Factors | Applicability in This Case |
|---|---|
| (1) The amount of the proposed payments and the amount of the debtor's surplus | The payments are very significant, with little or no surplus left for Debtors, and increase each time a secured debt is retired. |
| (2) The debtor's employment history, ability to earn and likelihood of future increases in income | Mr. Mattorano testified, without refute, of his history in the construction business, the number of annual projects he completes, the positive effect of COVID on the home-remodeling business, and the likelihood of future increases in income. |
| (3) The probable or expected duration of the plan | Debtors have committed to the maximum five-year plan to maximize the return to their creditors. |

| | |
|---|---|
| (4) The accuracy of the plan's statements of the debts, expenses, and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court | The Plan is accurate on these points; Creditors failed to prove "double dipping" on expenses and there has not been any attempt to mislead the Court. |
| (5) The extent of preferential treatment between classes of creditors | This factor does not apply to this case. |
| (6) The extent to which secured claims are modified | This factor does not apply to this case. |
| (7) The type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7 | As a result of the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") in 2005, this factor no longer holds as much weight. Prior to the enactment of BAPCPA, certain debts that were excepted from discharge under Chapter 7 could not be challenged under the broader Chapter 13 discharge. After the enactment of BAPCPA, almost all debts excepted from discharge under Chapter 7 are also excepted from discharge under Chapter 13. |
| (8) The existence of special circumstances such as inordinate medical expenses | The resort to Chapter 13 to prevent continuing collection from Creditors to allow Debtors breathing space to pay all their secured, priority, and unsecured creditors over time is a special circumstance in this case. |
| (9) The frequency with which the debtor has sought relief under the Bankruptcy Code | This is the first bankruptcy case filed by either Debtor. |
| (10) The motivation and sincerity of the debtor in seeking Chapter 13 relief | The duration of the plan and total amount paid to the creditors over five years weighs heavily in favor of Debtors. |
| (11) The burden which the plan's administration would place upon the trustee | The Chapter 13 Trustee withdrew his objection to confirmation and has not complained of any burden in administering the Plan. |

After the enactment of BAPCPA, the Tenth Circuit, in the case of *In re Cranmer*, 697 F.3d 1314 (10th Cir. 2012), affirmed the continued validity of the *Flygare* test in analyzing good faith and instructed the bankruptcy court to also consider: (i) whether the debtor has stated debts and expenses accurately, (ii) whether the debtor has made any fraudulent misrepresentation to mislead the bankruptcy court, and (iii) whether the debtor has unfairly manipulated the Bankruptcy Code. *Cranmer*, 697 F.3d at 1319 n.5.

9

The two main cases relied upon by Creditors in support of their contentions that the case has not been filed in good faith and the plan has not been proposed in good faith, *In re Gier*, 986 F.2d 1326 (10th Cir. 1993) and *In re Melendez*, 597 B.R. 647 (Bankr. D. Colo. 2019), are easily distinguishable. In *Gier*, the Tenth Circuit Court of Appeals affirmed two lower courts, who both found the Chapter 13 plan was not proposed in good faith, and denied confirmation. There, the debtors listed secured debt of $350,000 and unsecured debt of $480,000 in a Chapter 7 case filed in 1983. *Gier*, 986 F.2d at 1327. During the case, the bankruptcy court found that a debt of approximately $43,000 owed by Mr. Gier was non-dischargeable[4] and Mr. and Mrs. Gier ultimately received a Chapter 7 discharge of dischargeable debts. *Id.*

Mr. Gier alone filed a Chapter 13 case in 1987. *Id.* His schedules reflected secured debt in the amount of $67,000 and unsecured debt in the amount of $67,000. *Id.* His Chapter 13 plan proposed to pay $75 per month to the Chapter 13 Trustee, which equated to a 4% dividend to unsecured creditors. *Id.* He proposed to pay his secured debt outside the plan. *Id.* His budget showed a monthly surplus in the amount of $70. *Id.* The Tenth Circuit employed a totality of the circumstances test to arrive at the conclusions that the case was not filed in good faith and the plan was not proposed in good faith. *Id.* at 1328-29. It relied heavily on the bankruptcy court's factual findings that Mr. Gier had provided testimony inconsistent with his plan, that he filed Chapter 13 before his Chapter 7 case was closed, that he filed bankruptcy to discharge the otherwise non-dischargeable debt, and that he was not motivated by a desire to pay his creditors. *Id.* None of these conclusions are applicable here.

In *Melendez*, the Bankruptcy Court for the District of Colorado denied confirmation of a Chapter 13 plan on the basis that it was proposed in bad faith even though the Court found the income and expenses were stated accurately and there were no fraudulent misrepresentations. There, the debtor listed approximately $253,000 in liabilities of which approximately $180,000 was debt secured by his home. *Melendez*, 597 B.R. at 650-51. The debtor proposed to pay his secured debt outside the plan, continue to make a monthly contribution of $995 to his retirement account ($59,700 during the term of his plan), and only pay $142.03 per month into his Chapter 13 plan over sixty months, for a total of $8,521.80 in payments, none of which would be paid to his unsecured creditor class of approximately $66,000. *Id.* at 652.

The Court employed the totality of circumstances test and found that the debtor's proposal to contribute $59,700 to himself and nothing to unsecured creditors over five years evidenced bad faith, an abuse of the purpose and spirit of Chapter 13, and a manipulation of the Bankruptcy Code. *Id.* at 659-663. In fact, the Court found the plan enriched the debtor at the expense of his creditors. *Id.* at 661. Like *Gier*, these facts are

---

[4] The bankruptcy court found the debt was non-dischargeable because it was the product of willful and malicious conversion. At the time of Mr. Gier's bankruptcies, debts resulting from willful and malicious injuries were non-dischargeable in Chapter 7 but were dischargeable in Chapter 13. The *Gier* opinion implies that Mr. Gier's attempt to discharge approximately $43,000 of willful and malicious injury debt in the subsequent Chapter 13 filing was a factor that led to the finding that the Chapter 13 petition and plan was filed in bad faith.

10

markedly different from the facts in this case. Here, Debtors propose to pay $123,302 into the plan, of which $34,664 is paid to priority debt and $57,265 to unsecured creditors. There is not a significant difference between the rent the debtors were paying prior to bankruptcy and their current monthly mortgage payments. They canceled life insurance and have provided for substantial step-ups in plan payments as debt secured by personal property is retired. The Court finds Debtors have balanced the interests of creditors and themselves through the bankruptcy process, thereby keeping with the purpose and spirit of the Bankruptcy Code and favorably aligning with the additional three *Cranmer* factors.

### B. Feasibility

Under 11 U.S.C. § 1325(a)(6), the Court can only confirm a Chapter 13 plan if the debtor will be able to make all payments under the plan. Creditors argue the increase in monthly payments required under the Plan cause the Plan to not be feasible. The Court must assess whether the debtors have regular and stable income and future financial capacity to comply with the terms of the proposes plan. *In re Wark*, 542 B.R. 522, 539-40 (Bankr. D. Kan. 2015). For a plan to be feasible, the debtors must be current on plan payments. *Id.* at 40. Debtors have had relatively stable income from the remodeling business (Debtors Ex. 10, 11, 12), are sincerely motivated to comply with the terms of the Plan, and have the budgeting skills to complete the Plan. They should be afforded the opportunity to fund the Plan and pay their creditors.

### V. CONCLUSION

People are not perfect, and Debtors are not perfect. The role of the bankruptcy judge is to balance the interests of all parties with an eye toward providing a second chance and fresh start. Debtors made mistakes. The state court recounts 31 pages of mistakes. Mrs. Mattorano made mistakes in answering long, complicated, and onerous interrogatories. Debtors' counsel threw them to the wolves in answering the interrogatories rather than simply referring them to competent bankruptcy counsel to file a bankruptcy, make the disclosures required by the Bankruptcy Code, and stay all collection activities. The Court finds Debtors certainly have not made any fraudulent misrepresentations to the Court or manipulated the Bankruptcy Code. They have stated income and expenses as accurately as possible under the circumstances of a sole proprietorship remodeling company such as Premier. They could have attempted to minimize their disposable income and propose a shorter plan with far less than $57,265 being paid to unsecured creditors, but they have not done so in the Plan currently before the Court.

While a state court only resolves disputes between a creditor and a debtor, the bankruptcy court is required to consider the interests of all creditors and the debtor. Contrary to the assertion of Creditors, this is not a two-party dispute. Debtors need the protection of Chapter 13 to provide them with the opportunity to pay the Internal Revenue Service and Colorado priority tax claims. There are other unsecured creditors who will receive a substantial distribution on their claims. Debtors have not contested the dischargeability of Creditors' fraud claim and will have to live with the judgment until it is

satisfied. Their plan is to have an economically and emotionally stable life for five years and either sell or refinance their home after the plan term expires to satisfy Creditors.

As proof that this case has been filed in good faith, dismissal of the case will probably result in forced collection by the Internal Revenue Service, which has priority over Creditors, the resumption of other collection efforts, a race to the courthouse by competing creditors, and probable destruction of Debtors' business when Creditors garnish the customers. Such a result is not fair to Debtors, the other creditors, or the system.

The Court finds, by a preponderance of the evidence, the case was filed in good faith and the Plan is proposed in good faith and feasible. Therefore, the Plan is confirmed. A separate order confirming the plan will enter.

Dated this 5th day of October, 2021.

BY THE COURT:

_____

Joseph G. Rosania, Jr.
United States Bankruptcy Judge